UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

MARY NAYLOR,

    Plaintiff,

v.    No.

WESTLAKE PORTFOLIO
MANAGEMENT, LLC,

    Defendant.

## PLAINTIFF'S COMPLAINT

Plaintiff, MARY NAYLOR ("Plaintiff"), by and through her attorneys, Hormozdi Law Firm, LLC, alleges the following against Defendant, WESTLAKE PORTFOLIO MANAGEMENT, LLC ("Defendant").

## INTRODUCTION

1. Count I of Plaintiff's Complaint is based on the Telephone Consumer Protection Act., 47 U.S.C. § 227, *et seq.* ("TCPA").

2. Count II of Plaintiff's Complaint is based on the North Carolina Debt Collection Act, § 75-50, *et seq.* ("NCDCA").

## JURISDICTION AND VENUE

3. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.

4. This court has federal question jurisdiction because this case arises out of violations of federal law. 47 U.S.C. § 227(b); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).

5. This court has supplemental jurisdiction over the state claim alleged herein pursuant to 28 U.S.C. § 1367 it is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

6. Venue and personal jurisdiction in this District are proper because Defendant does or transacts business within this District, and a material portion of the events at issue occurred in this District.

## PARTIES

7. Plaintiff is a natural person residing in the City of New Bern, Craven County, State of North Carolina.

8. Plaintiff is a consumer as that term is defined by § 75-50(1) of the NCDCA.

9. Plaintiff allegedly owes a debt as that term is defined by § 75-50(2) of the NCDCA.

10. Defendant is a debt collector as that term is defined by § 75-50(3) of the NCDCA.

11. Plaintiff is, and at all times mentioned herein, a "person" as defined by 47 U.S.C. § 153(39).

12. Defendant is, and at all times mentioned herein, a "person" as defined by 47 U.S.C. § 153(39).

13. Within the last four years, Defendant attempted to collect a consumer debt from Plaintiff.

14. Defendant is a California limited liability company business based in the City of Los Angeles, Los Angeles County, State of California.

15. Defendant's business includes, but is not limited to, collecting on unpaid, outstanding account balances.

16. Defendant regularly collects, or attempts to collect, debts allegedly owed to itself.

17. During the course of its attempts to collect debts allegedly owed to itself, Defendant sends

to alleged debtors bills, statements, and/or other correspondence, via the mail and/or electronic mail, and initiates contact with alleged debtors via various means of telecommunication, such as by telephone and facsimile.

18. Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## FACTUAL ALLEGATIONS

19. Defendant is attempting to collect a consumer debt from Plaintiff, allegedly owed by Plaintiff and Plaintiff's husband arising from an automobile loan.

20. The alleged debt owed arises from transactions for personal, family, or household purposes.

21. In or around 2019, Defendant began calling Plaintiff in an attempt to collect the alleged debt.

22. Defendant calls Plaintiff on her cellular telephone at 727-809-6014 in an attempt to collect the alleged debt.

23. Plaintiff has answered several of Defendant's collection calls.

24. During the above-referenced collection calls:

    a. Plaintiff informed Defendant's collectors that Plaintiff's husband was unavailable because he was on active duty in the military; and

    b. Defendant's collectors refused to discuss the account with Plaintiff.

25. Defendant had no valid reason to refuse to discuss Plaintiff's husband's debt with Plaintiff. N.C. STATS. § 75-55(3).

26. Plaintiff then submitted to Defendant a power of attorney, executed by her husband, giving Plaintiff the authority to act on her husband's behalf.

27. Defendant continued to place collection calls to Plaintiff, which Plaintiff continued to answer.

28. During the above-referenced collection calls:

    a. Plaintiff informed Defendant's collectors that Plaintiff's husband was unavailable because he was on active duty in the military;

    b. Defendant's collectors refused to discuss the account with Plaintiff;

    c. Plaintiff reminded Defendant's collectors that Plaintiff had provided Defendant with a power of attorney, executed by Plaintiff's husband, giving Plaintiff authority to act on her husband's behalf;

    d. Defendant's collectors still refused to discuss the account with Plaintiff; and

    e. Plaintiff told Defendant's collectors to stop calling Plaintiff since they refused to speak to her regarding the account.

29. Despite Plaintiff requesting that Defendant stop calling Plaintiff, Defendant continued to call Plaintiff in an attempt to collect the alleged debt unabated.

30. Defendant's collectors have even went so far as to insult Plaintiff by stating that she sounds like

31. Defendant calls Plaintiff at an annoying and harassing rate.

32. Defendant's refusal to discuss the alleged debt with Plaintiff precipitated the wrongful repossession of Plaintiff's and her husband's automobile.

33. Defendant's actions violated, at the very least, the spirit of the Servicemembers Civil Relief Act 50 U.S.C. app. §§ 501 et seq. ("SCRA").

34. The natural consequences of Defendant's statements and actions was to produce an unpleasant and/or hostile situation between Defendant and Plaintiff.

35. The natural consequences of Defendant's statements and actions was to cause Plaintiff mental distress.

36. The natural consequences of Defendant's actions were to unjustly condemn and vilify Plaintiff and her family for non-payment of the alleged debt.

37. Prior to calling Plaintiff's cellular telephone, Defendant knew the number was a cellular telephone number.

38. Defendant has never had Plaintiff's prior express consent to call her cellular telephone with an automatic telephone dialing system.

39. Even if Defendant somehow had Plaintiff's consent, such consent was revoked as described above.

40. Defendant continued to call Plaintiff's cellular telephone after Defendant knew Plaintiff wanted the calls to stop.

41. Within four (4) years of Plaintiff filing this Complaint, Defendant used an automatic telephone dialing system to call Plaintiff's cellular telephone.

42. When Plaintiff answered Defendant's calls, she was greeted with "dead air" whereby no person was on the other end of the line. After several seconds, an agent was connected to the automated call then greeted Plaintiff and sought to speak with Plaintiff attempting to collect on the alleged debt.

43. The telephone dialer system Defendant used to call Plaintiff's cellular telephone has the capacity to store telephone numbers.

44. The telephone dialer system Defendant used to call Plaintiff's cellular telephone has the capacity to call stored telephone numbers automatically.

45. The telephone dialer system Defendant used to call Plaintiff's cellular telephone has the

capacity to call stored telephone numbers without human intervention.

46. The telephone dialer system Defendant used to call Plaintiff's cellular telephone has the capacity to call telephone numbers in sequential order.

47. The telephone dialer system Defendant used to call Plaintiff's cellular telephone has the capacity to call telephone numbers randomly.

48. The telephone dialer system Defendant used to call Plaintiff's cellular telephone selects telephone numbers to be called according to a protocol or strategy entered by Defendant.

49. The telephone dialer system Defendant used to call Plaintiff's cellular telephone simultaneously calls multiple consumers.

50. Defendant's calls constitute calls that are not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A).

51. The dead air that the Plaintiff experienced on the calls that she received is indicative of the use of an ATDS. This "dead air" is commonplace with autodialing and/or predictive dialing equipment. It indicates and evidences that the algorithm(s) being used by Defendant's autodialing equipment to predict when the live human agents are available for the next call has not been perfected and/or has not been recently refreshed or updated. Thus, resulting in the autodialer placing a call several seconds prior to the human agent's ability to end the current call he or she is on and be ready to accept the new connected call that the autodialer placed, without human intervention, to Plaintiff. The dead air is essentially the autodialer holding the calls it placed to Plaintiff until the next available human agent is ready to accept them. Should the calls at issue been manually dialed by a live human being, there would be no such dead air as the person dialing Plaintiff's cellular telephone would have been on the other end of the call the entire time and Plaintiff would

have been immediately greeted by said person.

52. As a result of Defendant's alleged violations of law by placing these automated calls to Plaintiff's cellular telephone without prior express consent, Defendant caused Plaintiff harm and/or injury such that Article III standing is satisfied in at least the following, if not more, ways:

   a. Invading Plaintiff's privacy;
   b. Electronically intruding upon Plaintiff's seclusion;
   c. Intrusion into Plaintiff's use and enjoyment of her cellular telephone;
   d. Impermissibly occupying minutes, data, availability to answer another call, and various other intangible rights that Plaintiff has as to complete ownership and use of her cellular telephone; and
   e. Causing Plaintiff to expend needless time in receiving, answering, and attempting to dispose of Defendant's unwanted calls.

## COUNT I:
## DEFENDANT VIOLATED THE TELEPHONE CONSUMER PROTECTION ACT

53. Defendant's conduct violated the TCPA by:

   a. Placing non-emergency telephone calls to Plaintiff's cellular telephone using an automatic telephone dialing system and/or pre-recorded or artificial voice, without prior express consent and/or after revocation, in violation of 47 U.S.C. § 227 (b)(1)(A)(iii).

WHEREFORE, Plaintiff, MARY NAYLOR, respectfully requests judgment be entered against Defendant, WESTLAKE PORTFOLIO MANAGEMENT, LLC for the following:

   a. As a result of Defendant's negligent violations of 47 U.S.C. § 227(b)(1), Plaintiff is entitled to and requests $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

   b. As a result of Defendant's willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff is entitled to and requests treble damages, as provided by

statute, up to $1,500.00, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

c. Plaintiff is entitled to and seeks injunctive relief prohibiting such conduct in the future.

## COUNT II:
## DEFENDANT VIOLATED THE NORTH CAROLINA DEBT COLLECTION ACT

54. Plaintiff repeats and realleges paragraphs 1-52 of Plaintiff's Complaint as the allegations in Count II of Plaintiff's Complaint.

55. Defendant violated the NCDCA based on the following:

   a. Defendant violated § 75-51 of the North Carolina General Statutes when it attempted to collect a debt alleged to be due and owing by an attempt to coerce payment of the alleged debt when Defendant continued to place collection calls to Plaintiff after Plaintiff requested Defendant stop calling her;

   b. Defendant violated § 75-52 of the North Carolina General Statutes when it used conduct the natural consequence of which is to oppress, harass, or abuse any person in connection with the attempt to collect the alleged debt when Defendant continued to place collection calls to Plaintiff after Plaintiff requested Defendant stop calling her;

   c. Defendant violated § 75-52(3) of the North Carolina General Statutes when it caused a telephone to ring or engaged a person in a telephone conversation with such frequency as to be unreasonable or constitute harassment to the person under the circumstances because Defendant continued to call Plaintiff even after Plaintiff told Defendant to stop doing so;

   d. Defendant violated § 75-54 of the North Carolina General Statutes by attempting

to collect a debt concerning a consumer by any fraudulent, deceptive, or misleading representation when Defendant created the false impression on Plaintiff that Defendant was permitted by law to continue to call Plaintiff with impunity despite Defendant being told to stop calling Plaintiff; and

e. Defendant violated § 75-55 of the North Carolina General Statutes by attempting to collect any debt by use of unconscionable means when Defendant engaged in the foregoing misconduct.

WHEREFORE, Plaintiff, MARY NAYLOR, respectfully requests judgment be entered against Defendant, NATIONAL PATIENT ACCOUNT SERVICES, INC., for the following:

56. Actual damages and civil penalties of not less than $500.00 nor greater than $4,000.00 per violation pursuant to North Carolina General Statute § 75-56(b);

57. Punitive damages pursuant to North Carolina General Statute § 75-56(c);

58. Costs and reasonable attorneys' fees; and

59. Any other relief that this Honorable Court deems appropriate.

RESPECTFULLY SUBMITTED,

June 17, 2020

By: /s/ Shireen Hormozdi
Shireen Hormozdi
HORMOZDI LAW FIRM, LLC
1770 Indian Trail Lilburn Road, Suite 175
Norcross, GA 30093
Tel: 678-395-7795
Fax: 866-929-2434
shireen@agrusslawfirm.com
shireen@norcrosslawfirm.com
Attorney for Plaintiff